

**The following constitutes
the order of the court. Signed March 24, 2016**

_____
**Charles Novack
U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 10-45940 CN |
| JACK ALBERT SHANE, III AND KRISTINA LYNN SHANE, | Chapter 7 |
| Debtors. | |
| CARMEN BETHKE, | Adversary No. 14-4092 CN |
| Plaintiff, | |
| vs. | MEMORANDUM DECISION AFTER TRIAL |
| JACK ALBERT SHANE, III, | |
| Defendant. | |

This court conducted a trial in this adversary proceeding over the course of three days. All parties were represented by counsel. Plaintiff Carmen Bethke is the mother-in-law of defendant Jack Shane, III. Bethke alleges that Shane defrauded her of her retirement savings, and she requests that this court enter a substantial non-dischargeable judgment against him. Bethke also alleges that Shane failed to list substantial assets and correctly report his income on his bankruptcy schedules and statement of financial affairs, and asks this court to deny him his Chapter 7 discharge. The following constitutes this court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

**The Facts**

Bethke was a long-time Kaiser Aluminum employee who did data entry work. In 2000, she opted for early retirement and the generous financial retirement package offered by Kaiser Aluminum. She retired with a $250,000 401k account, which she rolled over into a personal IRA with Sutro & Company. By 2008, her IRA balance had grown to almost $350,000. Bethke is not a financially savvy individual, and she relied on her Sutro & Company advisor to invest her IRA. Shane, who is married to Bethke's daughter, is a general contractor. In 2008, he had an ownership interest in four companies AJ Stone Builders, A-1 Liquid Transports (a trucking company), Stone Equipment Leasing, and A-1 Septic Tank Service, Inc. These businesses were suffering by 2008, which directly affected Shane's personal finances. While Shane's Statement of Financial Affairs lists gross 2008 income of $156,000, Shane's personal monthly expenses exceeded $20,000, including a $11,528 mortgage payment on his Hayward, California residence, and $2600 in monthly auto and motorcycle payments.[1] Shane was significantly over-extended in 2008, and the coming of the "Great Recession" affected his contracting business. AJ Stone Builders had borrowed $2.5 million from First Republic Bank to construct three substantial homes in Hayward, California, which debt Shane had personally guaranteed. These funds were not sufficient to complete the project. Shane's poor credit also interfered with his ability to invest in what he perceived to be a lucrative real estate opportunity with his cousin, Keith Brown. On February 1, 2008, Shane and Brown contracted to purchase an apartment complex in Lafayette, Indiana for $840,000 (the "17th & Center Apartments"). Shane and Brown created an LLC ("JJKM Investments, LLC") to take title and obtain financing for the purchase. JJKM's loan broker informed Shane, however, that given his poor credit, no bank would lend JJKM any funds if he was member of the LLC.

Such was the setting for the events giving rise to this adversary proceeding.

In April 2008, Shane informed Bethke the stock market was retreating, and that she should

---

[1] The Shanes' Bankruptcy Schedule J lists almost $20,000 in personal, monthly expenses. While the Shanes filed their Chapter 7 bankruptcy on May 24, 2010, the court believes that these personal expenses also existed in 2008. The Shanes' Schedule J omits, however, Shane's 2008 airplane note payments. Shane owned a Cessna airplane in 2008 (purchased in 2006; repossessed/returned in 2009) that he financed with a loan exceeding $150,000.

liquidate her Sutro & Co. IRA[2] and deposit those funds into a Washington Mutual bank account, which would at least generate interest. Shane informed Bethke that he would help her invest her funds. Bethke trusted Shane, who she believed was a successful businessman. At Shane's urging, Bethke liquidated her $342,780.10 IRA on April 28, 2008, paid the $35,039.96 tax on her early withdrawal, and deposited $315,484.71 on May 1, 2008 into a non-IRA Washington Mutual money market account. Shane promptly seized this opportunity to use these funds for his own benefit. Shane immediately borrowed $85,000 from Bethke (without the benefit of a promissory note or other written contract) and had her wire these funds into the 17th & Center Apartments escrow to help close the deal. JJKM, which was created on April 22, 2008, took title to the 17th and Center Apartments. While Shane wanted to participate in JJKM, the bank that was financing the purchase refused to allow Shane to participate in the transaction as a JJKM member due to his poor credit. As a result, Shane's grandmother (Lorraine Shane, who was also Brown's grandmother) replaced Shane as JJKM's other member. Lorraine Shane did not, however, repay the $85,000 to Shane, and Brown did not testify that he repaid these funds to Shane. While Shane testified that Brown repaid the $85,000 (which he claims to have invested into AJ Stone Builders' failing Hayward project), Shane did not present any documentary evidence to support this.

When he borrowed the $85,000 from Bethke, Shane did not disclose a) his poor financial condition, b) what he intended to do with the $85,000 (Shane did not discuss the 17th & Center Apartments deal with her), or c) how or when he was going to repay her. Shane never established any payment terms (either duration or interest rate) for the $85,000 loan, and he repaid only a small fraction of the amount. Rather, Shane exploited his mother-in-law's financial naivete and trust in him to liquidate her IRA and borrow funds without disclosing how or when he would repay her.

On July 18, 2008, Shane borrowed another $75,000 from Bethke and deposited the funds into AJ Stone Builder's bank account. Shane simply represented to her that he would repay her with interest, without disclosing his poor financial condition, and how and when he would repay her. Shane did not repay any of these funds.

---

[2] At this time, Sutro & Co. had been acquired by RBC Wealth Management.

3

Bethke also loaned Shane $100,000 (by cashier's check) on July 15, 2008. Shane informed Bethke that he needed to deposit these funds into AJ Stone Builders's Wells Fargo account to show his creditors that he had substantial funds in his account. Shane returned these funds (without interest) in September 2008.

The only "investment" that Shane presented to Bethke that was not overtly self-serving was Bethke's $245,305.40 investment in the Abbey-Marie apartment complex in Lafayette, California. In September 2008, Bethke signed a residential purchase agreement to purchase a 36 unit rental property in Lafayette, Indiana known as the "Abbey-Marie" property, for $1,412,700. Shane introduced Bethke to the Abbey-Marie property (he learned about the property through Cathy Brown, the Indiana real estate broker who worked on the 17th & Center Apartments purchase), and he persuaded her to purchase it. Shane represented to Bethke that he had investigated the Abbey-Marie property, and that a) the property was in very good to excellent physical condition in an excellent location; b) her tenants would primarily be Purdue University students; c) the Abbey-Marie property would provide her with monthly net income of $1700, and that she could expect that rents would increase; d) she would be the sole owner; and e) Keith Brown would help her manage the property. Bethke, who did not visit the property before the deal closed, relied on Shane's representations and allowed Shane to handle virtually all of the details necessary to close the transaction. Bethke wired $25,104 in August 2008 towards this investment, and sent an additional $220,201.40 by cashier's check in April 2009 to help close the deal.[3]

Little of what Shane represented to Bethke about the Abbey-Marie property was true. First, Bethke only became a joint owner of the Abbey-Marie property. Bethke lacked the credit to obtain the financing necessary to close the transaction, and as a result, Shane was forced to ask Carol Brown (Keith Brown's wife) to jointly purchase the property with Bethke. Bethke did not fully

---

[3] Shane presented a significantly different explanation of the Abbey-Marie investment. He testified that Bethke approached him and told him that she wanted to "do something" for her grandchildren. Shane also stated that while he did not forward to Bethke his emails with the brokers, he did keep her informed. This court discounts this testimony. The court notes that the total amount of Bethke's loans/investments exceed the net proceeds she received when she liquidated her IRA. The evidence establishes, however, that she was the source of all these funds.

4

DECISION
Case: 14-04092    Doc# 56    Filed: 03/24/16    Entered: 03/25/16 15:22:56    Page 4 of 11

understand this until after the sale closed.[4] While Carol Brown became a joint owner, she did not advance any of the funds necessary to close the Abbey-Marie deal. In addition, the Abbey-Marie property was a poor investment. A significant percentage of its tenants were subsidized "Section 8" tenants, and the property itself was in poor condition with substantial deferred maintenance (Brown and Bethke spent thousands of dollars replacing air conditioners, posts, and balconies). As a result, the Abbey-Marie property never generated a profit. Keith Brown, who manages the Abbey-Marie financial books, testified that Bethke has received slightly more than $10,000 in income from the Abbey-Marie property since the sale closed in the spring of 2009.

Shane represented Bethke in all aspects of the Abbey-Marie purchase. Bethke never contacted the real estate agent or loan broker who purportedly represented her in the Abbey-Marie transaction, and she never was told before the sale closed that she could qualify, standing alone, for the necessary financing. She relied on her son-in-law to handle these details. Virtually all of communications with the title company, real estate agent and loan broker were made to and by Shane and Keith Brown.[5] Other than to remind her what checks she had to write or money she had to wire, Shane did not keep her informed regarding the specifics of the sale.

Bethke and Brown financed the sale by borrowing approximately $900,000 secured by a conventional first deed of trust, and another $140,000 in seller-provided financing, which was secured by a potential deed of trust against Bethke's Logan Street residence in Oakland, California. The seller-provided financing came in the form of an "Un-recordable Promissory Note," which required 360 monthly payments of $931.43. Paragraph 8 of this note provides that "This is an unsecured note until such event as a default defined as any payment of this note that is more than 90 days late then this note shall revert to a secured note and as such may revert to being a recordable

---

[4] Both Bethke and Brown signed the September purchase agreement and other closing documents. Bethke, who this court finds to be a credible witness, said that she signed the closing documents as directed by Shane (who had accompanied her to the title company), and that she does not recall seeking Brown's signature on any of the closing documents. Bethke testified that she did not see the fully completed escrow documents until after she sued Shane in Alameda County Superior Court.

[5] In fact, Shane signed the original purchase agreement in April 2008.

5
DECISION
Case: 14-04092   Doc# 56   Filed: 03/24/16   Entered: 03/25/16 15:22:56   Page 5 of 11

note, inuring all costs and indebtedness of this note, and applicable to 3235 Logan Street, Oakland, Ca 94601 and any and all personal liability of Borrower to Lender."

Keith Brown testified that Bethke owes approximately $910,000 on the first deed of trust and $100,000 on the junior note. He further testified, without much detail, that Bethke had sued certain parties, including the Browns, regarding her Abbey-Marie investment, and that the parties had resolved that litigation. The settlement required the parties to sell the Abbey-Marie property, from which Bethke would receive $230,000. Brown stated that a) the Abbey-Marie property had been on the market for approximately one year at $1.4 million; b) he had not received any written offers; and c) potential buyers expected him to drop the price by several hundred thousand dollars. Such a sale would not generate any cash for Bethke.

Shane and his wife filed the underlying Chapter 7 case on May 24, 2010. Despite their substantial debt to Bethke, the Shanes did not list her as a creditor. The Shanes' Chapter 7 was a "no asset" bankruptcy, and they received their Chapter 7 discharge on August 31, 2010. Their Chapter 7 case closed on September 1, 2010. Despite receiving his discharge, Shane began making irregular monthly payments to Bethke in 2011, and by 2014, he had paid her approximately $13,000. In February 2014, Bethke sued, among others, Shane and the Browns in Alameda County Superior Court to recover her misspent retirement funds. Shane stopped payments when Bethke commenced litigation. Bethke shortly thereafter moved to reopen the Shanes' Chapter 7 bankruptcy in order to bring this adversary proceeding.[6]

The Shanes' bankruptcy documents were incomplete. First, the Shanes omitted to list Bethke as a creditor on their Schedule F. Shane testified that he forgot about his debt to his mother-in-law, and that he did not necessarily consider her to be a creditor. The Shanes also did not list certain personal property on their Schedule B, including a shotgun and some jewelry. As for the shotgun, Shane stated that he "forgot" about it. The omitted jewelry may have included several items. First,

---

[6] The court takes judicial notice of the Alameda County Superior Court complaint filed by Bethke on February 28, 2014, Case No. RG14715668. Bethke moved to reopen the Shane bankruptcy on May 19, 2014. The court presumes that the Alameda County litigation prompted Shane to disclose his bankruptcy filing to Bethke.

6

Shane failed to list his Omega Sea Master watch, which he valued for insurance purposes on his Fireman's Fund insurance schedule (which was prepared in or around June 2008) at $4,500. Shane explained that the watch was broken when they filed their Chapter 7, and therefore was worthless. Bethke also alleges that the Shanes did not list some of Kristina Shane's jewelry, consisting of a "woman's 6 carat tennis bracelet," "woman's diamond earring 1.5ct," and "woman's Omega watch," all of which they listed on their Fireman's Fund insurance schedule. There was no evidence, however, that the Shanes still owned this jewelry and watch when they filed their Chapter 7.

Finally, Bethke accused the Shanes of dramatically understating their income in response to question No. 1 on their Statement of Financial Affairs. The Statement of Financial Affairs required the Shanes to list their gross income from their employment or operation of business for the two full years preceding the calendar year in which they filed their Chapter 7, and their gross income for the calendar year of the bankruptcy filing. The Shanes listed 2008 gross income of $104,000, 2009 gross income of $52,000, and 2010 gross income of $56,687.00. Bethke contends, with little opposition, that Shane withdrew $1,049,108.63 in cash from AJ Stone Builder's First Republic Bank account and used $691,825.63 of these funds for cashier's checks, which ostensibly were used to pay business expenses. With certain additional adjustments, Bethke contends that Shane's business records demonstrate that there is $307,555.08 in unaccounted for cash, which must have been used to pay for the Shanes's living expenses.[7] While Shane denied that he used the cash for personal expenses, he did not offer any alternative explanation.

**Bethke's Claims under Bankruptcy Code § 523(a)(2)(A)**

Bethke's loans to Shane were a product of fraud, and this debt is non-dischargeable. Bankruptcy Code § 523(a)(2)(A) provides that "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing

---

[7] Bethke's exhibit 119 (which was a summary of Shane's First Republic and other bank accounts) stated that his First Republic cash withdrawals totaled $1,514,242.26, and that the corresponding cashier's checks amounted to $879,908.96 (Bethke also made an additional adjustment of $49,727.92). Exhibit 119 included, however, certain cash withdrawals and cashier's checks past the April 24, 2010 filing date. Question No. 1 of the Statement of Financial Affairs only seeks information regarding pre-petition income.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

of credit, to the extent obtained, by - (A) false pretenses, a false representation, or actual fraud[.]" A creditor must establish five elements by a preponderance of the evidence to prevail on a § 523(a)(2)(A) claim: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. *Ghomeshi v. Sabban (In re Sabban),* 600 F.3d 1219,1222 (9th Cir. 2010); *Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (9th Cir. BAP 2009). A §523(a)(2)(A) claim may also arise from the concealment or intentional non-disclosure of material facts. *In re Evans*, 181 B.R. 508, 515 n.6 (Bankr.S.D. Cal.1995). A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. CIR*, 829 F.2d 828, 832 (9th Cir. 1987); *Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015, 1018 (9th Cir. 1997); Donaldson v. Hayes (In re Ortenzo Hayes)*, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004). A § 523(a)(2)(A) claim requires that the "target misrepresentation must have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation." *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *5 (9th Cir. BAP Mar 19, 2013); *see also, New Falls Corp. v. Boyajian (In re Boyajian),* 367 B.R. 138, 147 (9th Cir. BAP 2007) (*citing Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill.2002)). Finally, Bethke must prove her non-dischargeability claim for relief by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Bethke has satisfied this standard for the two loans she made to Shane. Given his shaky financial circumstances and need for immediate cash, Shane's sole purpose in convincing Bethke to liquidate her IRA was to plunder it. Shane had no investment experience (and little cash with which to invest). Rather than "advising" her to prudently invest her retirement funds (which he had persuaded her to remove from a tax protected IRA, subjecting her IRA to a 10% early withdrawal tax penalty and future treatment as regular income), he immediately borrowed $85,000 to invest in the 7th & Center Apartment purchase with the vain hope of retaining his interest in the JJKM limited partnership. Shane did not disclose his precarious financial condition to Bethke, or when or how he would repay these funds. He also did not inform Bethke that he had no investment experience that

8

would allow him to advise or assist her with her retirement funds. While Shane stated that Brown repaid the $85,000, he provided no evidence of this. Even if Shane testified truthfully, he stated that he used those funds to prop up AJ Stone Builders' Hayward project. These were knowingly deceptive omissions. While Bethke's implicit trust in her son-in-law is worthy of some cynical head-shaking, she had known him for many years, he was family, he had the outward trappings of a successful businessman, and she therefore trusted that he would repay the funds with interest. He did not, to her detriment. Had Shane revealed his true intentions, she would not have liquidated her IRA and made this loan to him.

The same facts ring true regarding the $75,000 loan. Shane borrowed these funds without disclosing his precarious financial circumstances (thus establishing his inability to repay these loans), and what he was doing with these funds to ensure some ability to repay them. Shame deposited the $75,000 loan into the AJ Stone Builder's bank account, where it was spent on the Hayward construction project (and perhaps constituted some of the funds that Shane used for his own personal expenses). Bethke trusted her son-in-law to protect her interests, and she would not have loaned these funds if she had been told the truth. She again relied on Shane's material omissions to her detriment.

Shane's misrepresentations regarding the Abbey-Marie property investment also give rise to a non-dischargeable debt under § 523(a)(2)(A). Shane's representations regarding the condition, tenant composition, and profitability of the Abbey-Marie property were false, and he had no reason to believe that they were true. He never informed Bethke that she could not finance the purchase on her own, and that she would only be a 50% owner of the Abbey-Marie property. He intended Bethke to rely on these misrepresentations and she did, as she again trusted her son-in-law. The fact that Shane did not personally benefit from his fraud is irrelevant. *See Muegler v. Harre (In re Muegler)*, 413 F.3d 980 (9th Cir. 2005).

Bethke loaned Shane $160,000, and was repaid $13,000. She also invested $245,305.40 into

9

the Abbey-Marie property[8], and has received approximately $10,000 from that investment. Accordingly, the court finds that Bethke is entitled to a non-dischargeable judgment of $382,305.40, with interest to be determined upon Bethke's submission of a proposed judgment.[9]

**Bethke's Claims Under Bankruptcy Code § 727(a)(4)(A)**

Bethke also seeks to deny Shane's Chapter 7 discharge under Bankruptcy Code § 727(a)(4)(A). The difficulty with this request is that Shane received his Chapter 7 discharge on August 31, 2010, and Bethke does not explain how this court may deny his discharge after he has received one. Bethke must, then, look to Bankruptcy Code § 727(d) to revoke Shane's Chapter 7 discharge. Section 727(d)(1) is the applicable subsection, and it provides that this court may revoke a debtor's Chapter 7 discharge if "such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge." The deadline, however, for seeking § 727(d)(1) relief is "within one year after such discharge is granted." *See* § 727(e)(1). This court cannot extend this deadline (see Collier on Bankruptcy, § 727.18), and § 727(e)(1) is a statute of repose, not a statute of limitations that may be waived. *See In re Elliott (Weil v. Elliott)*, 529 B.R. 747 (BAP 9th Cir. 2015). Accordingly, Bethke's § 727 claims for relief are denied.

Bethke is to prepare and submit an appropriate judgment.

**\* \* \* END OF ORDER \* \* \***

---

[8] The evidence regarding the amount of Bethke's Abbey-Marie investment was not lucidly presented. Counsel did not sufficiently weave together the various emails, closing documents, and checks to support the amount requested in her post-trial brief. The wire transfer (exhibit 111) and cashier's check (exhibit 113) total $245,305.40. The court is uncertain whether the $25,104 wire transfer (exhibit 111) included the $10,000 deposit. During trial, Bethke or her counsel stated that her investment totaled $251,104. Bethke's post-trial brief, however, states that she invested $257,901.40. The court has examined Exhibit 36 and is not convinced how this exhibit evidences another $2700. The court is relying on the above wire transfer and cashier's check and finds that Bethke's damages arising from the Abbey-Marie property is $245,305.40.

[9] While Bethke's complaint also alleges non-dischargeable claims under §§ 523(a)(4) and (a)(6), her post-trial brief does not address them. The court therefore assumes that Bethke is relying solely on her (a)(2) claim for relief.

**COURT SERVICE LIST**

Recipients are ECF participants